# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MARIA MOULTHROP,       :
Plaintiff,           :
                :
v.             :   CASE NO. 3:16-CV-00220 (VAB)
                :
MICHAEL SLAVIN, ET AL,     :
Defendants.        :

## RULING ON DEFENDANTS' MOTION TO DISMISS

Plaintiff, Maria Moulthrop, brings several federal and state claims against Defendants, various individuals associated with the City of Waterbury Police Department ("WPD") and Waterbury Public Schools ("WPS"). Ms. Moulthrop's claims arise out of an internal investigation and subsequent criminal prosecution regarding her alleged mismanagement of school funds in her role as Principal of Hopeville Elementary School. The following parties are named as Defendants: Lieutenant Michael Slavin; Detective David McKnight; Detective Orlando Rivera; Chief Vernon Riddick; Mayor Neil O'Leary; Paul Guidone; Ronald Frost; Mary Ann Marold; Doreen Biolo; Thomas Pannone; and Frederick L. Dorsey.[1]

Ms. Moulthrop has alleged the following claims: conspiracy to perform an unreasonable search and seizure (Count One); false arrest (Count Two); malicious prosecution (Count Three); *Monell* failure to train (Count Four); violation of the Financial Privacy Act (Count Five); intentional spoliation of evidence (Count Six); and breach of contract (Count Seven).

Defendants Slavin, McKnight, Rivera, Riddick, O'Leary, Guidone, Frost, Marold, Biolo and Pannone (together "City Defendants") have moved to dismiss Counts One through Five and Count Seven of Ms. Moulthrop's Amended Complaint. City Defs. Mot. to Dismiss, ECF No. 37.[1] Defendant Frederick Dorsey has separately moved to dismiss Count Six of the Amended

---

[1] TD Bank, N.A. was initially named as a Defendant in this action, but has since been voluntarily dismissed. Notice of Voluntary Dismissal, ECF No. 46.

Complaint, Ms. Moulthrop's sole claim against him.  Dorsey Mot. to Dismiss, ECF No. 31.

For the reasons that follow, City Defendants' Motion to Dismiss is **GRANTED**, and Defendant Dorsey's Motion to Dismiss is **MOOT**.

## I.   FACTUAL BACKGROUND

Maria Moulthrop is the former Principal of Hopeville Elementary School ("Hopeville"), a public school in the City of Waterbury, Connecticut.  Am. Compl. ¶ 2.  In July 2011, the Connecticut State Department of Education ("SDOE") issued a report publishing students' test results on a statewide performance test.  *Id.* at ¶¶ 3-4.  That same month, a local newspaper in Waterbury raised suspicions about the relatively high performance of certain Hopeville students in light of the reported test results.  *Id.* at ¶ 4.  The SDOE subsequently hired Attorney Frederick Dorsey to conduct an investigation into suspected testing irregularities at Hopeville.  *Id.* at ¶ 8.

In August 2011, Ms. Moulthrop was placed on administrative leave without pay pending the investigation, along with several other Hopeville teachers and administrators.  *Id.* at ¶¶ 8-9.  During the course of the investigation, Attorney Dorsey conducted a taped interview of Ms. Moulthrop, which is no longer available.  *Id.* at ¶¶ 13-16.  Based at least in part on this interview, Attorney Dorsey prepared a formal report, dated September 2011, finding "sufficient credible evidence" that "testing irregularities" took place under Ms. Moulthrop's leadership.  *Id.*  Based in part on Attorney Dorsey's report, David Snead, Superintendent of Waterbury Public Schools, informed Ms. Moulthrop that the City of Waterbury was considering terminating her employment.  *Id.* at ¶¶ 27-28.

Thomas Pannone was appointed acting principal to replace Ms. Moulthrop for the 2011-2012 school year.  *Id.*  After Mr. Pannone commenced his term as acting principal, he came across bank statements in the name of the Hopeville Parent Teacher Organization ("Hopeville PTO") listing Ms. Moulthrop's home address.  *Id.* at ¶¶ 31-33.  Mr. Pannone forwarded this information to Ronald Frost, WPS Personnel Director, and Paul Guidone, WPS Chief Financial

Officer and Chief Operating Officer, who then used the information to access the Hopeville PTO

bank account at TD Bank. *Id.* Various WPS officials reviewed the bank statements of this

account, including Mary Ann Marold, WPS Education Liaison, and Doreen Biolo, WPS

Business Office Manager. *Id.* ¶¶ at 34-35.

Based on these account records, on December 6, 2011, Mr. Frost and Ms. Marold filed a

criminal larceny complaint with Lieutenant Slavin and Detective McKnight of the Waterbury

Police Department alleging that Ms. Moulthrop misappropriated school funds for personal use.

*Id.* Three days later, Ms. Moulthrop resigned from her position. *Id.* at ¶ 36.

### A.   Arrest Warrant Application

In December 2011, Lieutenant Slavin and Detective McKnight completed an application

for an arrest warrant before a Magistrate Judge. Arrest Warrant, City Defs. Ex. F, ECF No. 37-

7. In support of this arrest warrant, Lieutenant Slavin and Detective McKnight submitted an

affidavit outlining the evidence that had been provided against Ms. Moulthrop by Mr. Frost and

Ms. Marold. Arrest Warrant Affidavit, City Defs. Ex. G, ECF No. 37-8. This affidavit

explained that Mr. Frost contacted the Waterbury Police Department because he and Ms. Marold

"believed that Moulthrop may have solicited and used money raised by the parents and children

of Hopeville School for her own personal use, under the name of the non-existent Hopeville

School PTO." *Id.* at 3.

In support of this allegation, the arrest warrant affidavit explains that Mr. Pannone, in his

role as acting principal, noticed mail addressed to the Hopeville PTO listing Ms. Moulthrop's

home address on copies of Hopeville PTO checks. *Id.* According to the affidavit, Mr. Pannone

contacted Ms. Moulthrop, who confirmed that the account was in her name and who then

instructed TD Bank to have Mr. Frost be the sole account holder for that account. *Id.* The

affidavit states that, when Mr. Frost reviewed the bank statements of that account, he noticed

"questionable transactions" that were paid for using Hopeville PTO funds, including a payment of over $1,000 to Crestwood Ford and payments to BJ's Wholesale totaling around $2,000. *Id.* The payments made to BJ's Wholesale included numerous BJ's gift cards, an Apple iPod for $237.99, a Casio camera for $249.99, and several food items that, according to the affiant, were not offered at the Hopeville cafeteria. *Id.* at 5-7.

According to the Amended Complaint, however, Ms. Moulthrop never gave permission for Mr. Frost to access that account. The Amended Complaint states: "Frost used the Hopeville PTO TD Bank statements he received from Pannone on September 2, 2011, to unlawfully gain access to Moulthrop's Hopeville PTO TD bank account by misrepresenting that Superintendent Snead owned the account, convincing TD Bank to remove Moulthrop as the sole signer and account owner without her authorization, and adding Frost's name as the sole signer on the account." Am. Compl. ¶ 33. It is undisputed that the account was in the name of the Hopeville PTO at the time Mr. Frost gained access, and that Ms. Moulthrop had previously been the only individual with access to that account.

### 1. Hopeville PTO

One of the core allegations supporting Lieutenant Slavin's and Detective McKnight's application for an arrest warrant is that the Hopeville PTO did not actually exist. *Id.* at 3. In support of this contention, Lieutenant Slavin and Detective McKnight cited Mr. Frost and Ms. Marold as having stated that "each individual PTO has a board of directors that, to their knowledge, must approve all expenditures and fundraisers and that no one person would ever have control over the entire organization." *Id.* at 3. The Hopeville PTO, however, did not have a board of directors and was under Ms. Moulthrop's exclusive control. *Id.*

According to the affidavit, "Detective McKnight found an online definition for a PTO" which stated that a PTO "is a group of parents and teachers that work together for the benefit of

the school and the children being educated there and it is usually recognized by the IRS as a nonprofit, tax-exempt group." *Id.* The affidavit further stated that "Principal Pannone also conducted his own interviews with Hopeville School teachers and found there has not been a PTO at Hopeville in over 10 years." *Id.* at 4. The affidavit confirmed that only Ms. Moulthrop seemed to have knowledge of this PTO, suggesting that the PTO was not a valid entity. *Id.*

The arrest warrant affidavit also includes a statement from Mr. Frost in which he claimed that Molly Hernandez, a parent of a Hopeville student, made a "formal complaint" expressing concern about Ms. Moulthrop's fundraising activities in connection with the Hopeville PTO. *Id.* at 2. The affidavit states that, according to Mr. Frost, Ms. Moulthrop was selling snacks in the Hopeville cafeteria for one dollar apiece to raise funds for the Hopeville PTO. *Id.* Mr. Frost allegedly told the WPD investigators that Ms. Hernandez was concerned about this activity because "there is not a PTO at Hopeville School and there has never been one." *Id.* The affidavit also states that the City of Waterbury provided Ms. Moulthrop with a stipend of 50 cents per student, which was allegedly supposed to be "used for student related activities and placed in a student activity fund"; however, "there was no student activity fund at Hopeville School while Moulthrop was Principal." *Id.* at 11. Instead, Ms. Moulthrop placed those funds directly into Hopeville PTO account. *Id.*

Ms. Moulthrop, however, insists that the Hopeville PTO was a valid organization. According to Ms. Moulthrop, a PTO does not require a board of directors or bylaws. Am. Compl. ¶¶ 103-106. She also alleges that Ms. Marold was aware of this fact when communicating with the WPD regarding Ms. Moulthrop's case and that both Mr. Frost and Ms. Marold intentionally made false representations to the police in connection with this investigation. *Id.* She further states that various individuals at Hopeville were paid for school-related expenses out of the Hopeville PTO account, and that those individuals knew that the

5

payments were being made in the name of the Hopeville PTO.  *Id.* at ¶ 100.

## 2. Crestwood Ford Purchase

In addition to the description of Mr. Frost's and Ms. Marold's concerns about the Hopeville PTO, the affidavit provided detailed descriptions of several of the purchases from the Hopeville PTO account that the affiant deemed questionable.  One such description included a written statement from Denise Benemerito, one of the former owners of Crestwood Ford, which Ms. Benemerito had provided in response to an inquiry from the WPD regarding a $1,061.80 expense to Crestwood Ford that was reflected in the Hopeville PTO account.  *Id.* at 7. According to the affidavit, Ms. Benemerito stated that, after Crestwood Ford closed in 2010, she opened a new business by the name of Bone Appetite.  *Id.*  Ms. Benemerito further stated that, to her surprise, Ms. Moulthrop came into Bone Appetite one day and asked Ms. Benemerito whether she remembered an incident in which Ms. Moulthrop "wrote a check from the wrong checkbook" to pay for car repairs.  *Id.*  Ms. Benemerito allegedly responded by saying that she "[did] not remember anything like that."  *Id.*  According to Ms. Benemerito, Ms. Moulthrop was "persistent about this and kept saying that she was so upset because she wrote a check from the wrong checkbook, she even mentioned that she wrote the check out of a PTO account."  *Id.*  Ms. Benemerito noted that Ms. Moulthrop was holding two one-hundred dollar bills in her hand when she had this conversation, explaining: "I felt that her having the money in her hand was her trying to pay me off for agreeing with her story."  *Id.*

In addition to Ms. Benemerito's account of this transaction, the arrest warrant affidavit also includes a summary of Ms. Moulthrop's version of events in connection with this particular purchase.  The affidavit states:

> Moulthrop told us that she had written a check to Crestwood Ford out of the Hopeville PTO account by accident because her personal checkbook is the same color as the Hopeville PTO checkbook. Moulthrop stated that the Hopeville check bounced and as a result she deposited $1300.00 from her personal account

into the Hopeville PTO account.   Moulthrop did show us a photocopy of the transaction receipts from this deposit from her personal account into the Hopeville PTO account.

*Id.* at 10.  The affidavit further notes that "Moulthrop stated she would keep the receipts in her office but once she was removed from Hopeville School she has no idea what happened to the receipts." *Id.*

### 3. Leaf Blower Purchase

The affidavit also describes other incidences of suspected misuse of school funds. Specifically, the affidavit notes that Ms. Moulthrop was recorded to have purchased a backpack leaf blower from the Home Depot for $316.94; however, the affidavit states that, according to Victor Martinez, a custodian at Hopeville, the school only had one backpack leaf blower, which Ms. Moulthrop had purchased from Schmidt and Serafine's.  *Id.* at 10 ("About five years ago Maria bought me a backpack leaf blower for the school from Schmidt and Serafine's.  This is the only blower we ever got from Maria.  I am 100% positive the blower we have now is the only one Maria bought for the school.").  According to the affidavit, when asked about this purchase, Ms. Moulthrop confirmed to WPD officials that she had purchased two separate leaf blowers with school funds, explaining that "the leaf blower she bought broke down so she purchased another leaf blower with PTO funds." *Id.*

### 4. Flat Screen Television and Camera Purchases

Finally, the affidavit describes that Ms. Moulthrop, while on administrative leave, returned some items to Hopeville from her possession that had been purchased using Hopeville PTO funds, including a flat screen TV and a Casio camera.  *Id.* at 11.  According to the affidavit, the television showed "obvious signs of wear."  *Id.*  When Ms. Moulthrop was questioned about these purchases, she explained that "she brought those items to her home so her son could teach her how to use them."  *Id.*  The affiant expressed suspicion at this response, noting that

7

"Moulthrop had full access to the City of Waterbury IT department who would have been able to help her with any technical problems she had with the TV or camera." *Id.*

### B.   Arrest and Criminal Prosecution

The arrest warrant application was approved and a warrant was signed by a Magistrate Judge. *Id.* On June 28, 2012, Ms. Moulthrop was arrested and charged with larceny. Am. Compl. ¶ 39. Shortly afterwards, the SDOE initiated proceedings to revoke Ms. Moulthrop's educator certificates. *Id.* at ¶¶ 40-43. Ms. Moulthrop requested a formal hearing in connection with the revocation proceedings, and the SDOE did not respond to that request. *Id.* at ¶¶ 51-53.

The larceny charges against Ms. Moulthrop proceeded to trial. *Id.* at ¶ 48. During the criminal trial, Defendants provided testimony on cross-examination establishing that Lieutenant Slavin and Detective McKnight did not have training or specialization in forensic accounting when they investigated the criminal complaint against Ms. Moulthrop. Hr'g Tr., Pl. Ex. 9, ECF No. 67. Ms. Marold and others also testified that it is not a legal requirement in the City of Waterbury for a PTO to register with the city or maintain a board of directors or bylaws. Am. Compl. ¶¶ 104-105.

Ms. Moulthrop alleges that, on November 12, 2014, she was acquitted of all charges. *Id.* at ¶ 48. As of the date of Ms. Moulthrop's Amended Complaint, the SDOE has not revoked her educator certificate, and she further alleges that the SDOE has denied multiple requests for a hearing in connection with those revocation proceedings. *Id.* at ¶¶ 51-53.

## II.  STANDARD OF REVIEW

When considering a motion to dismiss under Fed R. Civ. P. 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir.) (citation omitted), *cert. denied*, 537 U.S. 1089 (2002). The proper

consideration is not whether the plaintiff ultimately will prevail, but whether the plaintiff has stated a claim upon which relief may be granted such that the plaintiff should be entitled to offer evidence to support her claim. *See id*. at 125.

In reviewing a complaint under Rule 12(b)(6), the Court applies "a 'plausibility standard,'" which is guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). First, the Court must accept as true the allegations in a complaint, but this requirement "is inapplicable to legal conclusions." *Id*. Although "detailed factual allegations" are not required, a complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). Second, to survive a motion to dismiss, the complaint must state a plausible claim for relief. *Iqbal,* 556 U.S. at 679. Determining whether the complaint states a plausible claim for relief is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679).

Although courts considering motions to dismiss under Rule 12(b)(6) generally "must limit [their] analysis to the four corners of the complaint," they may also consider documents that are "incorporated in the complaint by reference." *Kermanshah v. Kermanshah*, 580 F.Supp.2d 247, 258 (S.D.N.Y. 2008). Before considering materials outside the record on a motion to dismiss, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exists no material disputed issue of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (internal citations omitted).

## III. DISCUSSION

City Defendants seek dismissal of all claims against them (Counts One, Two, Three,

9

Four, Five, and Seven).[2]  City Defs. Mot. to Dismiss, ECF No. 37.  Defendant Dorsey seeks

dismissal of Ms. Moulthrop's Connecticut common law intentional spoliation of evidence claim

(Count Six).  Dorsey Mot. to Dismiss, ECF No. 31.  Together, Defendants seek dismissal of the

Amended Complaint in its entirety.   Each motion to dismiss is discussed in turn.

### A.   CITY DEFENDANTS' MOTION TO DISMISS

#### 1.   Count One: Unreasonable Search and Seizure Conspiracy

In Count One of her Amended Complaint, Ms. Moulthrop alleges that three Waterbury

Police Department officers, Lieutenant Slavin, Detective McKnight, and Detective Rivera,

conspired with five Waterbury Public Schools representatives, Guidone, Frost, Marold, Biolo

and Pannone, to violate Ms. Moulthrop's Fourth and Fourteenth Amendment rights as well as

her rights under the Connecticut Constitution.  Am. Compl. ¶¶ 201-205.  She specifically alleges

that these Defendants worked together to illegally access bank records owned by Ms. Moulthrop

using false and misleading information.  *Id.*

Defendants seek dismissal of this count for failure to state a claim under Rule 12(b)(6). In

support of their motion, Defendants argue that (1) the claim is barred by the intra-corporate

conspiracy doctrine; (2) Ms. Moulthrop has failed to plausibly allege the existence of an

"agreement" between the parties as required for a civil rights conspiracy claim; and (3) Ms.

---

[2] In Count Five, Ms. Moulthrop seeks to hold Lieutenant Slavin, Detective McKnight, Detective Rivera, and Defendants Guidone, Frost, Marold, Biolo and Pannone liable under the Right to Financial Privacy Act ("RFPA"), codified at 12 U.S.C. §§ 3401 et seq.  Defendants seek dismissal of this claim, arguing that only a "financial institution" can be liable under the clear language of RFPA and thus, Ms. Moulthrop fails to state a viable claim against all of the individuals named as Defendants in this Count.  *See* 12 U.S.C. § 3417 (limiting liability to "[a]ny agency or department of the United States or financial institution" that violates statutory provisions); *Liffiton v. Keuker*, 850 F.2d 73, 78 (2d Cir. 1988) (noting that RFPA "authorizes such suits only against agencies or departments of the United States or financial institutions, 12 U.S.C. § 3417(a), and not against individual agents or employees" and concluding that "these claims, as alleged against individuals, were properly dismissed" (internal citations and marks omitted)). Defendants further argue that any action alleged under the RFPA is time-barred because the lawsuit was not brought within three years of the allegedly improper disclosure.  *See* 12 U.S.C. § 3416; *Giannone v. Bank of Am., N.A.*, 812 F. Supp. 2d 216, 220 (E.D.N.Y. 2011) (dismissing RFPA claims for failure to file complaint within the three-year statute of limitations).  Ms. Moulthrop does not address these arguments at all in her opposition brief.  As Ms. Moulthrop's pleadings do not support an RFPA claim, Count Five is dismissed.

Moulthrop lacks standing to challenge the search and seizure of bank records, as the account was owned by the "Hopeville School PTO" rather than by Ms. Moulthrop.

Before considering the various defenses raised by Defendants, the Court first considers the threshold question of whether Ms. Moulthrop has standing to bring this claim. *See, e.g., In re Facebook, Inc., Initial Pub. Offering Derivative Litig.*, 797 F.3d 148, 155 (2d Cir. 2015) (addressing questions of standing as "threshold grounds for denying audience to a case on the merits" (internal citation omitted)). "In order to have standing, a party must allege (1) a personal injury in fact, (2) a violation of his or her own, not a third-party's, rights, (3) that the injury falls within the zone of interests protected by the constitutional guarantee involved, (4) that the injury is traceable to the challenged act, and (5) that the courts can grant redress for the injury." *Johnson ex rel. Johnson v. Columbia Univ.*, No. 99 CIV. 3415 (GBD), 2003 WL 22743675, at *12 (S.D.N.Y. Nov. 19, 2003) (citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472–74 (1982)). When a Fourth Amendment civil rights conspiracy has been alleged against city officials, "[t]he Court recognizes that the threshold inquiry is whether there exists a constitutional right to privacy in the information disclosed by the City. The analysis ends if there is no right to privacy in the information disclosed." *Id*. at *9 (S.D.N.Y. Nov. 19, 2003).

The Court concludes that the alleged conduct in Count One does not constitute a violation of Ms. Moulthrop's own rights, nor does the alleged injury fall within the zone of interests protected by the cited constitutional provisions. Ms. Moulthrop's civil rights conspiracy claim is based exclusively on the efforts made by city officials to access a supposedly school-related bank account. Am. Compl. ¶ 202. It is undisputed that, although Ms. Moulthrop was listed as the "sole signatory," *Id.* at ¶ 160, this account was opened as a "non-personal account" in the name of "Hopeville School PTO" under a TIN number attributed to that entity.

TD Bank Records, City Defs. Ex. B, ECF No. 37-3; IRS EIN Request, City Defs. Ex. C, ECF No. 37-4.  Throughout the Amended Complaint, Ms. Moulthrop insists that the Hopeville PTO was a legitimate entity that used school funds for school-related purposes, not an individual account for personal gain. *See* Am. Compl. ¶¶ 77, 160.  Thus, Ms. Moulthrop's individual right to privacy was not implicated by the accessing of the school account, and she lacks standing on this ground.

Furthermore, the alleged violation of privacy here is not legally recognized or protected. Ms. Moulthrop has not identified any case law suggesting that she has a constitutionally protected right to privacy in bank records that she opened in her capacity as an employee of the City of Waterbury, in the name of a Waterbury public school, and using funds that were raised in connection with school-related activities.  Furthermore, Ms. Moulthrop was no longer actively serving as Hopeville's Principal at the time the City Defendants accessed the Hopeville PTO bank records.  Accordingly, any expectation of privacy Ms. Moulthrop had in those records was unreasonable.

In order to establish a legitimate expectation of privacy for Fourth Amendment purposes, "first, [plaintiff] must demonstrate a subjective expectation of privacy in a searched place or item; and second, [her] expectation must be one that society accepts as reasonable." *United States v. Chuang*, 897 F.2d 646, 649 (2d Cir. 1990).  Drawing all reasonable inferences in favor of the plaintiff, Ms. Moulthrop fails to establish any reasonable expectation of privacy in Hopeville PTO bank records.  Ms. Moulthrop lacks standing to bring this claim against City Defendants, and Count One is properly dismissed.

As an alternative ground for dismissal, Defendants argue that, even if Ms. Moulthrop did have standing to bring a civil rights conspiracy claim, her claim is barred by the intra-corporate conspiracy doctrine.  The Court agrees.

"The 'intra-corporate conspiracy' doctrine generally provides that a corporation or public entity 'generally cannot conspire with its employees or agents as all are considered a single entity.'" *Broich v. Inc. Vill. of Southampton*, 650 F. Supp. 2d 234, 246–47 (E.D.N.Y. 2009) (quoting *Everson v. New York City Transit Auth.*, 216 F.Supp.2d 71, 76 (E.D.N.Y. 2002)). "Under the intra-corporate conspiracy doctrine, officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other." *Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d 198, 216 (E.D.N.Y. 2015), *aff'd sub nom. Bartels v. Schwarz*, 643 F. App'x 54 (2d Cir. 2016) (internal marks and citations omitted).

Ms. Moulthrop has alleged her civil rights conspiracy claim against individuals associated with two departments of the City of Waterbury—the Waterbury Police Department and Waterbury Public Schools. All individuals named in this count are employees of the City of Waterbury. "As such, plaintiff's conspiracy claim would be barred by the intra-corporate conspiracy doctrine." *Id.* (granting summary judgment on conspiracy claim where "the only parties to the conspiracy would be the Village defendants who are all employees of a single municipal entity, viz. the Village.").

The intra-corporate conspiracy doctrine only applies, however, to defendants who are acting within the scope of their employment when conducting the alleged conspiracy. *See id.* "'An exception to the intracorporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity.'" *Cowan v. City of Mount Vernon*, 95 F.Supp.3d 624, 650 (S.D.N.Y. 2015) (quoting *Castanza v. Town of Brookhaven*, 700 F. Supp. 2d 277, 292 (E.D.N.Y. 2010)). "In order for the exception to apply, '[t]he plaintiff must also allege that [the defendants] acted other than in the normal course of their corporate duties.'" *Ali v. Connick*, 136 F.Supp.3d 270, 283 (E.D.N.Y. 2015) (quoting

*Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 72 (2d Cir. 1976)).

Ms. Moulthrop concedes that "[a]t first look the intracorporate conspiracy doctrine would appear applicable here." Pl. Mem. in Opp. At 1.  Nonetheless, she argues that Defendants could not have been acting in furtherance of the City of Waterbury's interests when working together to prepare her arrest warrant because they intentionally communicated false and/or misleading information. *Id.* at 4-12.  According to Ms. Moulthrop, Lieutenant Slavin and Detective McKnight claimed that they had conducted an investigation when they knew that their investigation was inadequate. *Id.*  Ms. Moulthrop also alleges that three of the WPS employee Defendants, Mr. Frost, Ms. Marold and Mr. Pannone, knowingly made misrepresentations to Lieutenant Slavin and Detective McKnight regarding the legal requirements of operating a PTO and the alleged non-existence of the Hopeville PTO.[3]

While Ms. Moulthrop acknowledges that each of these contested statements were made "primarily within the employer's authorized time and space limits," she nonetheless contends that Defendants were acting in their own interests rather than in the course of their employment, claiming that they "were not motivated by a purpose to serve the employer" and were not "authorized to perform" the contested actions. *Id.* at 4.  Ms. Moulthrop characterizes Defendants' actions as completing "[a]ffidavits which knowingly and intentionally contain false statement[s]" and "[o]bstructing a police officer." *Id.* at 7, 10, 12.  In light of the alleged illegality of these actions, she argues, Defendants could not have been acting in furtherance of "the purposes of their employer." *Id.*

Although Ms. Moulthrop now insists that Defendants were pursuing their personal interests by making inaccurate statements to the Waterbury Police Department about the

---

[3] Ms. Moulthrop's opposition brief does not directly mention any false or misleading statements made by Defendants Rivera, Guidone, or Biolo with respect to Count One.

Hopeville PTO and overstating investigative efforts in the WPD's arrest warrant application, the

Amended Complaint itself does not include any factual allegations suggesting that the specified

WPD and WPS officials acted "other than in the normal course of their corporate duties." *See

Guichard v. Town of Brookhaven*, 26 F. Supp. 3d 219, 228 (E.D.N.Y. 2014) (personal stake

exception to intra-corporate conspiracy doctrine did not apply to civil rights conspiracy claim

where "the Complaint does not contain a single allegation that Tohill, Incagliato, or any other

Town employee were pursuing personal interests wholly separate and apart from the Town when

Defendants entered Plaintiff's property."). When ruling on a motion to dismiss under Rule

12(b)(6), the Court is limited to the "four corners of the complaint" as well as documents

incorporated by reference. *McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 191 (2d Cir.

2007). Allegations made in an opposition brief to a motion to dismiss are not included in this

analysis, and it is well-settled that conclusory allegations cannot suffice to survive dismissal. *Id.*

As police officers, the official duties of Lieutenant Slavin, Detective McKnight and

Detective Rivera include investigating allegations of criminal activities. Those very same

investigative efforts are the subject of Ms. Moulthrop's conspiracy claim.[4] Thus, the alleged

misconduct is in no way "wholly separate" from Defendants' duties as officials of the Waterbury

Police Department, and the "personal interest" exception to the intra-corporate conspiracy

doctrine does not apply. *See Ali*, 136 F. Supp. 3d at 283 (citing cases finding personal stake

exception where police conducted activities outside the scope of their duties, such as "cover[ing]

up the use of excessive force … engag[ing] in race-based false arrests to improve their chances

---

[4] Furthermore, Ms. Moulthrop appears to be contesting the adequacy of those investigative efforts more than the truth or falsity of the officers' representations in the arrest warrant application. Pl. Mem. in Opp. at 5-7 ("McKnight did not verify if a PTO had to register with the city, did not full[y] investigate fundraising conducted by the Plaintiff, did not reasonably investigate the expenses related to Junipers restaurant, did not speak to any teachers or parents at hopeville school to verify the existence of the PTO, did not request from the city of Waterbury any documents indicating that Hopeville School had a PTO, failed to find out how PTOs in the City of Waterbury register or obtain permission to act or review any policies or procedures about the registration of PTOs in the City of Waterbury – yet still concluded one did not exist in the Hopeville School.").

of promotions and benefits … and assault[ing] a prisoner in retaliation for his participation in a federal lawsuit"). Accordingly, the intra-corporate conspiracy doctrine applies as to Defendants Slavin, McKnight and Rivera, and Ms. Moulthrop fails to state a conspiracy claim against the WPD Defendants.

As public officials representing Waterbury's public school system, the official duties of Defendants Guidone, Frost, Marold, Biolo and Pannone presumably include overseeing the administration of public schools. All of the contested communications made by these Defendants relate directly to an active investigation into Ms. Moulthrop's administration of public school funds; thus, they similarly cannot be deemed "wholly separate" from the scope of Defendants' employment with WPS as required to defeat the intra-corporate conspiracy doctrine. *See Cowan,* 95 F.Supp.3d at 650.

Ms. Moulthrop has made some factual allegations suggesting that these officials wanted her to be removed from her position, *see, e.g.,* Am. Compl. ¶ 37 (referencing an e-mail from Board of Education Commissioner Jason Van Stone, not named here as a defendant, "who, after being informed…that Moulthrop had resigned and without hearing any evidence, responded 'Damn, I really wanted to fire her'"); however, these allegations are not sufficient to suggest a personal interest for purposes of defeating the intra-corporate conspiracy doctrine. *See Bond v. Bd. of Educ. of the City of New York*, No. 97 CV 1337, 1999 WL 151702, at *2 (E.D.N.Y. Mar. 17, 1999) (finding that even though complaint included allegation that defendant wanted to "get rid of" plaintiff, "personal bias does not constitute personal interest and is not sufficient to defeat the intracorporate conspiracy doctrine"). Thus, the intra-corporate conspiracy doctrine applies, and Ms. Moulthrop fails to state a conspiracy claim against the WPS Defendants as well.

### 2. Count Two: False Arrest

In Count Two, Ms. Moulthrop alleges that Lieutenant Slavin and Detective McKnight misrepresented the facts when they applied for an arrest warrant, violating her federal and state

constitutional rights.  Am. Compl. ¶¶ 206-209.  Defendants argue that the arrest warrant was

nonetheless supported by probable cause, which is fatal to Ms. Moulthrop's false arrest claim.

"It is settled that a person has a clearly established right not to be arrested or prosecuted

without probable cause."  *Soares v. State of Conn.*, 8 F.3d 917, 920 (2d Cir. 1993).  "The

existence of probable cause to arrest constitutes justification and is a complete defense to an

action for false arrest, whether that action is brought under state law or under § 1983."  *Gonzalez*

*v. City of Schenectady,* 728 F.3d 149, 155 (2d Cir. 2013) (internal citations and quotes omitted).

The issuance of an arrest warrant by a neutral magistrate judge generally creates a "presumption

that it was objectively reasonable for the officers to believe that there was probable cause"; for

this reason, "a plaintiff who argues that a warrant was issued on less than probable cause faces a

heavy burden."  *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir. 1991).

In order to argue successfully that a warrant was issued without probable cause, "a

plaintiff must show that the officer 'knowingly and intentionally, or with reckless disregard for

the truth, made a false statement in his affidavit or omitted material information, and that such

false or omitted information was necessary to the finding of probable cause.'"  *Kaskel v.*

*Compagnone*, No. 15-3802-CV, 2016 WL 6885701, at *1 (2d Cir. Nov. 22, 2016) (citing *Soares*,

8 F.3d at 920); *see also McColley v. County of Rensselaer,* 740 F.3d 817, 823 (2d Cir. 2014);

*Tyus v. Newton*, No. 3:13-CV-1486 (SRU), 2015 WL 1471643, at *6 (D. Conn. Mar. 31, 2015).

If a "corrected" warrant application would still support a finding of probable cause, then the

allegedly false or omitted information could not have been "necessary," and the false arrest

claim must fail as a matter of law.  *See McColley*, 740 F.3d at 823 (citing *Escalera v. Lunn,* 361

F.3d 737, 743-44 (2d Cir. 2004)).

Ms. Moulthrop has failed to plausibly plead a lack of probable cause in this case, as none

of the allegedly omitted information was "necessary" to the probable cause finding underlying

the arrest warrant.  The Amended Complaint alleges that Lieutenant Slavin and Detective McKnight, who prepared the application and completed the sworn affidavits associated with Ms. Moulthrop's arrest warrant, made "material omissions" in their application by failing to conduct interviews with various additional individuals in their investigation of the criminal complaint and by failing to include specific information about the use of student activity funds at other schools. Am. Compl. ¶¶ 206-209.  Although the Amended Complaint repeatedly references "false" statements, Ms. Moulthrop does not actually allege that any of the statements made by Lieutenant Slavin and Detective McKnight in the arrest warrant affidavit are untrue; instead, she focuses on the alleged "omission" of information that, according to Ms. Moulthrop, should have been investigated and included in the affidavit.  *See* Pl. Mem. in Opp. at 5-7.

According to both the arrest warrant and the Amended Complaint, Ms. Moulthrop operated a parent-teacher organization at Hopeville, without any oversight, in which no other parents or teachers were directly involved.  The bank records of that organization reflected several expenses that were arguably suspicious, including: a payment made out to Crestwood Ford for over $1,000 for car repairs that Ms. Moulthrop herself admits should not have been paid for with Hopeville PTO funds; a backpack leaf blower that, according to a Hopeville employee, was never given to the school; and a flat screen TV and Casio camera that, at least for a time, were not kept at Hopeville but rather at Ms. Moulthrop's home.  City Defs. Ex. G.

These undisputed facts provide strong support for the Magistrate Judge's conclusion that probable cause existed as to the suspected larceny in this case.  Furthermore, the arrest warrant affidavit also provides a description of Ms. Moulthrop's version of events alongside the WPS officials' descriptions of each of these incidents; despite this additional information, the magistrate judge who reviewed the application nonetheless found sufficient probable cause to approve the arrest warrant.  Taking as true all of the factual allegations included in the four

corners of the Amended Complaint, the general allegations offered in support of Ms. Moulthrop's false arrest claim are not sufficient to overcome the strong presumption of probable cause here.

Even if the warrant application were "corrected" to include the alleged omitted details, the undisputed facts nonetheless support a finding of probable cause. Accordingly, Count Two of the Amended Complaint is dismissed.

### 3. Count Three: Malicious Prosecution

In Count Three, Ms. Moulthrop alleges malicious prosecution on the part of Defendants Guidone, Pannone, Biolo, Marold, and Frost. Am. Compl. ¶¶ 210-215. These Defendants seek dismissal of Count Three, arguing that they did not "initiate" the criminal proceedings as required for a malicious prosecution claim and that the criminal prosecution was supported by probable cause.

"To succeed on a claim of malicious prosecution, the plaintiffs must show (1) the defendants' commencement or continuation of the proceeding against them, (2) the termination of the proceeding in their favor, (3) the absence of probable cause for the proceeding, and (4) actual malice." *Simmons v. Chemung County Dept. of Social Services,* 770 F.Supp. 795, 801 (W.D.N.Y. 1991) (citing *Broughton v. State of N.Y.*, 37 N.Y.2d 451, 457, *cert. denied,* 423 U.S. 929 (1975)); *see also Manganiello v. City of N.Y.*, 612 F.3d 149, 160-161 (2d Cir. 2010). A finding of probable cause is fatal to any malicious prosecution claim. *See Jovanovic v. City of N.Y.*, 486 F.App'x 149, 152 (2d Cir. 2012) ("An element of any malicious prosecution claim is the absence of probable cause").

The factual allegations in the Amended Complaint indicate that the criminal prosecution against Ms. Moulthrop was supported by probable cause. As noted above, there was substantial evidence supporting probable cause for Ms. Moulthrop's arrest that was wholly separate from

the allegedly false information provided by Defendants about the Hopeville PTO's legal existence or its registration requirements.  The same evidence that supported her arrest also supported the probable cause for Ms. Moulthrop's prosecution.  *See Bertuglia v. City of N.Y.*, 133 F. Supp. 3d 608, 632 (S.D.N.Y. 2015), *aff'd sub nom. Bertuglia v. Schaffler*, No. 15-3455-CV, 2016 WL 7107979 (2d Cir. Dec. 6, 2016) ("The crucial inquiry for a claim of malicious prosecution is not whether [defendants] actually overbilled and defrauded the Port Authority but whether the evidence from the investigation supports a finding of probable cause to believe that [defendants] had knowingly overbilled the Port Authority such that a reasonable person would believe they had committed grand larceny.").  Even though Ms. Moulthrop was ultimately acquitted of all charges under the higher evidentiary burden that is applied at a criminal trial, the clear presence of probable cause based on the factual allegations in the Amended Complaint confirms that Ms. Moulthrop has not stated a viable malicious prosecution claim.  *Id.*

Even if the Court were to find that Ms. Moulthrop has plausibly pled a lack of probable cause, her allegations still fail to state a claim for malicious prosecution.  Defendants argue that the individuals named in this Count, all of whom are WPS officials and not WPD officers, did not "initiate" the proceedings against Ms. Moulthrop because their only involvement was reporting suspected crime and answering questions posed by law enforcement.  In *Watson v. Sims,* the Second Circuit reviewed the dismissal of a malicious prosecution claim in which the plaintiff, like Ms. Moulthrop, was a former school employee who alleged that members of a city school board provided false information in connection with the plaintiff's prosecution for financial crimes.  *Watson v. Sims*, 648 F.App'x 49 (2d Cir. 2016), *cert. denied*, (U.S. Jan. 9, 2017).  The Second Circuit affirmed the district court's grant of summary judgment on this claim, stating: "We have explained that 'reporting a crime to law enforcement and giving testimony does not constitute the initiation of a criminal prosecution. More is required. Specifically, the complainant must have played an active role in the prosecution, such as giving

20

advice and encouragement or importuning the authorities to act.'" *Id.* at 51 (quoting *Rothstein v. Carriere*, 373 F.3d 275, 293–94 (2d Cir. 2004) (internal marks and citations omitted)). Defendants here did no more than "report[] a crime to law enforcement and giv[e] testimony"; thus, they did not "commence or continue" the proceedings, and Ms. Moulthrop lacks another essential element of a malicious prosecution claim. *Id.*

Ms. Moulthrop's allegations regarding the falsity of the information Defendants provided does not overcome these fatal flaws in her malicious prosecution claim. Dismissal of a malicious prosecution claim may still be appropriate even if the defendants' testimony was false. *See id.* at 52 ("Assuming, *arguendo*, that Sims or Baker provided false or misleading information to the prosecution during its investigation, we find no evidence, viewing the record in the light most favorable to Watson, from which a reasonable jury could conclude that either Sims or Baker took an active role in Watson's criminal prosecution."); *see also Bertuglia*, 133 F. Supp. 3d at 630 ("There is an exception for a defendant who has fabricated evidence or provided false testimony. To prevail in a § 1983 malicious prosecution action premised on false and fabricated statements, those statements must have been the proximate cause of the prosecution.").

The Court finds that Ms. Moulthrop has failed to state a malicious prosecution claim against Defendants Guidone, Pannone, Biolo, Marold, and Frost. Accordingly, Count Three of the Amended Complaint is dismissed.

### 4. Count Four: *Monell* Claim

Count Four alleges *Monell* liability as to Chief Riddick only, in his official capacity as Chief of the Waterbury Police Department. Am. Compl. ¶¶ 216-219. In support of Defendants' motion to dismiss this claim, Defendants argue that this claim should have been brought against the City of Waterbury, and that Count Four should be dismissed based solely on Ms. Moulthrop's failure to name the municipality as a Defendant. City Defs. Mem. in Supp. at 27-

28.

In *Monell v. Department of Social Services of City of New York,* 436 U.S. 658 (1978), the United States Supreme Court determined that, in order for an individual plaintiff to bring a Section 1983 action against a municipality and its officials for monetary relief, the municipality must have officially adopted and promulgated policies that caused unconstitutional actions.  *Id.* at 690 ("Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.").  A municipality's policies must be the "moving force" behind the alleged constitutional violation in order for those policies to serve as the basis for a section 1983 claim.  *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389 (1989) (citing *Monell,* 436 U.S. at 694; *Polk County v. Dodson,* 454 U.S. 312, 326 (1981)).  "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."  *Id.*

A *Monell* claim is actionable only as to local governing entities and related municipal officials.  *Id.*  Where the relevant governing entity would be liable under *Monell,* individuals acting in their official capacity may also, in some circumstances, be held liable for their role in the alleged constitutional violations.  *See Booker v. Bd. of Educ., Baldwinsville Cent. Sch. Dist.*, 238 F.Supp.2d 469, 475 (N.D.N.Y. 2002) ("in order for an individual to be liable in his or her official capacity under § 1983, the liability of the governmental agency must be established under *Monell*" (citing *Kentucky v. Graham,* 473 U.S. 159, 166 n.14 (1985))).  "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be

subjected to (3) a denial of a constitutional right." *Wray v. City of New York,* 490 F.3d 189, 195 (2d Cir. 2007).

Ms. Moulthrop alleges that Chief Riddick, in his official capacity as Chief of the Waterbury Police Department, violated her constitutional rights through his failure to provide training to WPD officers in the "investigation of complaints of financial improprieties" and his "deliberate indifference… to the misuse of his department's investigatory resources." Am. Compl. ¶¶ 217-218. Defendants argue that Ms. Moulthrop cannot state a *Monell* claim against Chief Riddick based on policies allegedly held by the City of Waterbury. However, this argument is unavailing. The Amended Complaint clearly notes that Chief Riddick is sued in his official capacity; accordingly, a suit against Chief Riddick is essentially the same as a suit against the municipality itself. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits … 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell,* 436 U.S. at 690)); *Booker*, 238 F. Supp. 2d at 475 ("district courts have dismissed official capacity claims against individuals as redundant or unnecessary where *Monell* claims are asserted against an entity.").

Although the liability of the City of Waterbury is an essential component of a *Monell* claim against Chief Riddick, Ms. Moulthrop does not have to name the City of Waterbury explicitly as a Defendant in order to bring a claim against Chief Riddick in his official capacity, as it would be "redundant" and "unnecessary" to name them both. *Id.* Thus, Ms. Moulthrop's failure to name the City of Waterbury does not warrant dismissal of her *Monell* claim.

Ms. Moulthrop's *Monell* claim, however, suffers from more fundamental deficiencies which require dismissal. The Supreme Court in *Monell* held that "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." *Canton,* 489 U.S. at 385. "Thus, our first inquiry in any case alleging municipal liability

under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id.* At a basic level, Ms. Moulthrop fails to state a claim because she has not actually alleged a constitutional deprivation. The allegedly unconstitutional actions at issue here involve: (1) the search of bank records that were held in the name of a Waterbury public institution, and (2) the arrest and prosecution of Ms. Moulthrop for larceny based on facts showing probable cause that Ms. Moulthrop committed larceny. These actions are not recognized constitutional violations, thus there can be no "direct causal link" as required for an actionable *Monell* claim.

Even if Ms. Moulthrop were found to have identified a legitimate constitutional violation, which she has not, her *Monell* claim would nonetheless fail as a matter of law due to the lack of identifiable "policy" on the part of City officials that could have caused the alleged harm. In order to state a *Monell* claim based on failure to train, as with a *Monell* claim based on inadequate supervision, a plaintiff must allege that the failure to train constitutes a "policy or custom," which requires deliberate indifference on the part of the municipal official. *See Canton*, 489 U.S. at 379 (1989) ("The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train in a relevant respect amounts to deliberate indifference to the constitutional rights of persons with whom the police come into contact."); *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) ("a city's failure to train its subordinates satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need."); *McLaurin v. New Rochelle Police Officers,* 368 F.Supp.2d 289, 293-94 (S.D.N.Y. 2005) (indicating that a failure to train or supervise requires "deliberate indifference" in order to constitute a "policy" under *Monell* and dismissing *Monell* claim for failure to adequately plead the existence of a municipal

"policy").

Beyond repeated conclusory assertions that Chief Riddick acted with "deliberate indifference," *see* Am. Compl. ¶¶ 75, 91, 218, the Amended Complaint does not contain any factual allegations that would support a finding of deliberate indifference in this case.  Without this essential element, Ms. Moulthrop's claim cannot survive dismissal.  *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (dismissing *Monell* claim for failure to meet requirement "that plaintiffs establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also that plaintiffs identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." (quoting *Canton,* 489 U.S. at 391)).

As discussed above, Ms. Moulthrop cannot plausibly allege that any constitutional rights were violated by the WPS officers' investigation in her case.  Accordingly, Ms. Moulthrop does not and cannot plausibly allege that Chief Riddick was deliberately indifferent to constitutional violations as required for a viable *Monell* claim.  Thus, Count Four of the Amended Complaint is appropriately dismissed.

### 5. Count Seven: Breach of Contract

Finally, City Defendants argue that Ms. Moulthrop's breach of contract claim against Mayor O'Leary must be dismissed because the Mayor, as a city official, cannot be personally liable for contractual agreements in which the municipality is the employer.[5]  Ms. Moulthrop disagrees, insisting that Mayor O'Leary may be held liable for the City of Waterbury's alleged breach of its employment contract.

---

[5] Count Seven specifically alleges that the City violated its contractual obligations by failing to pay her for the nine- day period between November 30, 2011 and December 9, 2011, the effective date of her resignation.  Am. Compl. ¶ 43.

As Counts One through Five have already been dismissed, there are no remaining federal claims in this action.  When federal claims are dismissed prior to trial, district courts are instructed to decline supplemental jurisdiction over any remaining state law claims.  *See, e.g. Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118 (2d Cir. 2006) (holding that district court's exercise of supplemental jurisdiction over state law claims was not justified following dismissal of all federal claims); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well").  Accordingly, the Court declines to exercise supplemental jurisdiction over Ms. Moulthrop's state law claims at this time, and Counts Six and Seven of the Amended Complaint are dismissed without prejudice to re-filing in Connecticut Superior Court.

### B.   DORSEY MOTION TO DISMISS

Attorney Fredrick Dorsey seeks dismissal under Rule 12(b)(6) of Count Six of the Amended Complaint, which alleges common law spoliation of evidence based on his alleged destruction of a videotaped interview with Ms. Moulthrop.  This is the only claim alleged against Mr. Dorsey, and it is brought under Connecticut common law.

As noted above, the Court has dismissed all federal claims listed in the Amended Complaint and declined to exercise supplemental jurisdiction over any remaining state law claims.  *See id.*  Count Six is dismissed on this basis; accordingly, Mr. Dorsey's motion to dismiss for failure to state a claim under Rule 12(b)(6) is denied as moot.

### C.   LEAVE TO AMEND

The Court finds that, in light of the issues discussed above in connection with Ms. Moulthrop's claims, further amendment of the Amended Complaint would be futile.  "Where it appears that granting leave to amend is unlikely to be productive… it is not an abuse of

discretion to deny leave to amend." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citing *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir. 1993)). Ms. Moulthrop has already amended her Complaint once, and, after two attempts, the facts underlying Ms. Moulthrop's claims fail to state a claim for relief on any recognized federal grounds.  Thus, the Court denies leave to amend the Amended Complaint, and all federal claims are dismissed with prejudice.

## IV.  CONCLUSION

The motion to dismiss filed by Defendants Slavin, McKnight, Rivera, Riddick, O'Leary, Guidone, Frost, Marold, Biolo and Pannone [ECF No. 37] is **GRANTED**.  Counts One, Two, Three, Four and Five are dismissed for failure to state a claim under Rule 12(b)(6).  In light of the dismissal of all federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims in this case, and Counts Six and Seven are dismissed without prejudice to re-filing in Connecticut Superior Court.  The motion to dismiss filed by Defendant Dorsey [ECF No. 31] is **MOOT**.

The Clerk of the Court is directed to enter a judgment in favor of Defendants and close this case.

SO ORDERED in Bridgeport, Connecticut this 31st day of January, 2017.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
DISTRICT JUDGE